Curia, per
O’Neall, J.
The medical society of South Carolina was incorporated in the year 1794. In 1817, by the Act to regulate the licensing of Physicians, and for other purposes therein mentioned, they were constituted a board of Physicians at Charleston, to examine and license applicants to practice physic and surgery ; and also to license apothecaries to vend medicine. In 1823, the medical society was, by an Act of the legislature of that year, authorized to organize a medical school at their own expense, to consist of such professorships as they may deem expedient, and to confer medical degrees upon such candidates as may qualify themselves therefor, under the regulations which they may establish. In 1824, the medical society elected professors, and they undertook to be at all the expenses of the institution ; the honorary members of the society were constituted a board of trustees, and rules and regulations for the government of the school were adopted. The trustees and professors applied to, and obtained from, the city council of Charleston, the use of a part of the poor house square, for the purpose of erecting the lecture rooms of the professors. In 1825, the faculty of the college (as the professors are hence-forward called) applied to, and obtained from, the city council, an appropriation of $15,000, and a lot of land, for the purpose of enabling them to erect a more suitable and convenient *396 building for the school, upon the condition that they should, lay out the said sum in erecting a building for the college, on the lot connected' with the Marine Hospital; that the building should be kept in good repair while they use it, and that they should supply the Poor House and Marine Hospital with medical attendance for twenty years ; and that at the end of this time, the city council should be at liberty to make such order, and require such conditions, for the further use of the said building, as to them shall seem meet. The professors, as individuals, according to the resolution of the council, gave their bonds for the performance of these conditions. In December of this year, the legislature made an appropriation of $10 000 for the medical college, to be drawn by, and placed at the disposal of, the faculty, for the completion of their building, and the purchase of apparatus necessary and proper for such an institution. In 1830, a further appropriation of $7000 was made for the medical college, to be paid to the order of the faculty of the college. In 1831 the legislature passed an Act to incorporate the medical college, by the name and style of the President, Trustees and Faculty of the Medical College of South Carolina. The Act directs that the board shall consist of thirteen members; six to be elected by the Medical Society of South Carolina, and six to be appointed by the Governor ; the President of the Medical Society for the time being to be, ex officio, a member and President of the board. The power of conferring medical degrees is given to the trustees, and “all the rights, powers and duties heretofore conferred upon, or required of, the Medical Society in relation to the Medical College, are transferred to and vested” in, the said corporation created by this Act. The Medical Society refused to elect the trustees whom they were authorized to elect by the Act, or in anywise to acquiesce in it. The Governor nominated as trustees N. Heyward, S. Prioleau, B. F. Dunkin, H. L. Pinckney, C. J. Colcock and R. J. Turnbull, who, with the faculty, have exercised all the rights, privileges and immunities which are by the Act conferred on the corporation created by it. The Medical Society applied to Mr. Justice Bay for a quo war- *397 ranto, who refused the application ; and a motion is now made to reverse his decision. The only question necessary to be considered is, whether the Act of the General Assembly to incorporate the Medical College of South Carolina, passed on the 17th of December, 1831, is constitutional. It is to be regretted by every citizen of the State, that the prosperity of so admirable and-beneficial an institution as the Medical College, should be, in any degree, endangered by the contest which has prevailed for some time, between the faculty and the Medical Society. It is a subject of pride to every Carolinian, that such an institution has so soon grown up, and reached to mature usefulness. It is peculiarly honorable to the able, talented and persevering members of the faculty, that they have furnished a medical education at home, to the young and rising generation, equal to any which is to be found in older and better endowed seminaries. With feelings common to every citizen, who will look to the considerations which I have stated, we have been called on to decide a question, which we are aware may injure an institution so worthy of being cherished. It is, however, not only in relation to the college, a delicate question, but we feel that it is so in another point of view. The constitutionality or unconstitutionality of an Act of the legislature is, at all times, a grave and serious question. For the lawmakers, as well as the judiciary, are in some degree the keepers of the constitution. They, as well as we, are bound by the most solemn of all sanctions, “ to preserve, protect and defend itand we are well aware that they are not disposed, deliberately, to trench upon it. It does, however, happen, and always will happen, that, looking only to utility, the question of constitutional law may be (as we presume it was on this occasion) entirely overlooked in legislation.
As was well observed in the argument of the counsel for the respondent, no Act of the legislature ought to be pronounced unconstitutional by the judiciary, unless it be clear, beyond all doubt, that it is so. When, however, this is the case, I know no duty more sacredly enjoined upon us, and none more firmly and unhesitatingly to be perform *398 ed, than to interpose ourselves between the legislature and the constitution. In doing so, no legislature of this State ever has supposed, or ever will suppose, that the judiciary desire to take so responsible a situation, from any other motive than a conviction that it isa paramount duty to do so.
The constitutionality of the Act depends upon the inquiry, whether the Medical College is to be regarded as apart of the chartered rights of the Medical Society of South Carolina. If it is, then it follows that it is a private institution, founded by a private corporation, and liable only to be visited by it, and governed by the laws which it has thought, and may think, proper to ordain for it. The correct solution of this inquiry, must depend upon the Acts of the legislature, in relation to the Medical Society and the Medical College, and the facts which have been already stated in the history of this case ; and from them I shall proceed, in the first place, to deduce the conclusion, that the Medical College is a private institution, founded by the Medical Society, and afterwards to shew the legal effect of this conclusion, as to the constitutionality of the Act to incorporate the Medical College of South Carolina.
By the Act incorporating the Medical Society, they are authorized to purchase and hold real estate, the annual income of which shall not exceed £300 sterling. This provision has been noticed, not so much from any effect it has had on our minds in coming to the conclusion we have made, as from a desire to meet, as far as we can, every view which was taken in favor óf the respondents.' It is true, this limitation would prevent them from acquiring real estate beyond that annual income, but it does not, therefore, follow, that they might not be the legal owners of the college lot and buildings for twenty years. For what is annual-income ? It is that sum which (when derived from property) the owner annually receives from the use of it. If he leases a house and land to one, to be used in educating the poor, or to receive and educate students for a certain reward to be paid to the occupant, it cannot be said that the owner derives any income from this source. The public benefit is his only reward. Neither is there *399 any certain separate income derived from the estate, even to the occupant; the teacher may make his vocation in that place valuable to him; still the income is derived from his institution, and not from the house or land. This is the case with the Charleston Medical College building and lot; they are devoted by the owner, whoever it may be, to medical instruction, and from them no income is derived.
To the professors, their lectures delivered in the college building, are, as they should be, a source of annual income ; it is the just reward paid to them by the students, for the communication of that science and learning, which are so honorable to them and useful to the State.
The preamble to the Act of 1823 recites, “ whereas the Medical Society have taken measures for the establishment of a medical school, to be conducted by persons chosen by them, and at their own expense, and have petitioned for the power to confer degrees.” Although I am not disposed to attach any great importance to the preambles of the Acts of our legislature, for they are generally prepared before the bills are matured, and are often allowed to pass without any critical examination, yet when they undertake to set out the grounds upon which the legislature have thought proper to act, and these are found to be consistent with the enactment, they constitute a pretty sure guide as to the intention of the law, and must have legal effect in giving construction to it.
It is manifest from the preamble, which is in perfect accordance with the enactment, that the legislature did not intend to establish a public corporation, of which they were to be regarded as the founders. It recites that “ the Medical Society have taken measures for the establishment of a Medical School.” This is the same recitation which would have been made, with the variation of the names, if any citizen had established, or was about to establish, the school, and had applied for an Act to enable him to carry his project into complete effect. It shows conclusively, that the Medical Society, and not the State, was the founder. It is “ to be conducted by persons chosen by them, (the Medical Society) and at their own expense.” The *400 legislature, in this, shewed their sense that the institution was to be established by private enterprize, and not by the liberality of the State, and was, therefore, to be beyond their control. The powers of appointment and removal are generally the same, at least in one sense; they must be derived from one source, if exercised by different agents. The legislature do not pretend that they are to confer the right to appoint; it is “ to be conducted by persons” selected, ot-to be selected, by the Medical Society,' as their agents, and not the agents of the State. The persons to conduct the school, are here recognized as the appointees of a private corporation, and, of course, responsible to it alone. But it is supposed that the words “ at their own expense,” refer to the persons by whom the school was to be conducted, and not the Medical Society. This, so far as regards the question between the State and the Medical Society, whether the college is a public or private corporation, is wholly unimportant; but upon another branch of the case, by whom is the college to be regarded as founded, by the society or the professors ? it may be important, and it is, therefore, better now to give construction to these words. The words, from their sense and meaning, apply to the Medical Society. If the words, “ to be conducted by persons chosen by them,” were included, as they ought to be, in a parenthesis, there would be no room for any grammatical doubt about the application of the words, “at their own expensethey would then clearly refer to the Mediical Society as the antecedent of the word “ their.” But on reading the preamble in reference to the facts which have been exhibited to us, there can be no doubt about the application of the words. It appears from the extract from the journal of the Medical Society, of the 2d of February, 1824, that they understood the words at “ their own expense,” to mean at the expense of the society. The professors were not then appointed, and the society referred the subject of establishing the school to a committee, who reported “ that the funds of the society, it is too well known, are not in a condition to allow of its extending any considerable pecuniary patronage to the proposed seminary, without exhibiting a degree of generosity *401 inconsistent with prudence ; yet your committee are satisfied, that even this serious obstacle is by no means insurmountable ; they are confident your professors elect will take upon themselves, willingly, the burden of the expenses of the establishment.
“ They cannot believe that there is among us a single individual who, if chosen from the rest for the fulfilment of so desirable an object, would not freely contribute his share of the necessary expenditures ; your committee have, therefore, left this subject altogether for the determination of the lecturers or professors whom you may hereafter appoint.” This report was adopted, and constituted the foundation of the college. It shews how the words, at “ their own expense,” were understood by the society, including the professors, who were afterwards chosen from the members of the society. Independent, however, of this cotemporaneous construction of the words, by the very parties now before the court, the same construction will be obtained by referring to the persons who were in being at the time the Act of 1823 was passed, and who must, therefore, be regarded as alone within the intendment of the legislature. The professors of the Medical College were not then appointed, and were not, therefore, legally existing. Of persons not yet in legal existence, and whose will could not be known, it is impossible that the legislature could have intended to say, that they had undertaken to establish and conduct the school “at their own expense.” Of the Medical Society, the legislature might very well infer, that such was their understanding. For they had set out in their petition that they had taken measures to establish the school, and had only asked for the power to confer degrees. It was from this statement and request fairly to be inferrred, that by their own means the school would go into operation, and all that they needed was that they might have a legal sanction to confer its academic privileges upon the students. The preamble recites that the Medical Society “ have petitioned for the power to confer degrees.” This was asking, in other words, that they might be made a Medical College; and *402 if the State, with this matter thus brought distinctly to their view, thought proper to make the grant, reserving no control over them to herself, how can it be pretended that she has afterwards any right to interfere with her own grant, or to deprive her grantee of its privileges, but for a violation of its implied condition by misuser or non-user, to be ascertained by the law of the land, as administered by the courts of justice 'l
After stating further in the preamble, that it is the duty of an enlightened government to aid the advancement of science, the legislature enact that “the Medical Society of South Carolina shall be, and they are hereby, authorized to organize a Medical School, to consist of such professorships as they may deem expedient, and to confer medical degrees upon such candidates as'may qualify themselves therefor, under the regulations which they may establish.” The Act thus confers upon the Medical Society, 1st. The power to organize the school. 2d. The power to establish as many professorships as they may deem expedient. 3d. The power to confer medical degrees; and 4th. the power to make the laws necessary for the government of the school These four powers, it seems to me, were all which the State had to confer, and having granted them, that nothing remained but that she should see that they were legally exercised by her grantee.
It is generally true, that he who furnishes the means in land or money, whereby a charity is created, is legally the founder, and as an incident thereto, has the right “ to inspect, regulate, control and direct it.” But to constitute a legal founder, I am not satisfied that it is, in all cases, indispensable that he should furnish any pecuniary aid. If the State or a corporation establish a college, and appoint professors, with fees for instruction, and one person afterwards furnishes land on which a building is put up, and another the money to erect the buildings, and to purchase the necessary apparatus, and the State or the corporation has the power of removing the professors, and of making laws for the whole institution, does it not follow that the State or the corporation is the founder, and not *403 the doners ? The powers incident to a foundation belong to the State or the corporation, and when they are acknowledged, we may as legitimately deduce from them the cause, as we could from it the effect. The donation is in trust, it is true, for the purposes oí the institution, and cannot be otherwise applied. But it is not the creation of the college, and it is this which makes a foundation. The institution has existence, and the donation only makes it more generally useful. But this part of the case is, perhaps, unimportant, for I do not understand that either the State or the city council claim to be founders, on account of their respective appropriations. It is contended that the professors are the founders, and that the Medical College is to be regarded as distinct from the Medical Society.
The professors themselves were created by the Medical Society ; it is by their appointment that they deliver lectures and receive fees. They accepted their appointments upon the express condition, that they should bear “ the burden of the expenses of the establishment.” They became, thereupon, the agents of the society, not only to deliver lectures, but also to endow the Medical College.
The first act which was done in giving effect to the establishment of the college, was the procuring the use of a part of the poor-house lot, for the purpose of erecting the lecture rooms of the professors. This was the joint act of the trustees and professors, appointed by the Medical society, and this, it cannot be pretended, was a foundation by the faculty alone. It was the act of the society, for it was done by all of their agents constituted to manage the school. All the subseqent donations were made by the city council, or the State, at the instance of the, professors, as the faculty of the Medical college, or were made by the professors themselves. To say that they could do any act in that character which would enable them to say, We are independent of the very power which gave it to us, which enacts laws for our government, and which we have accepted, and to which we have consented to be amenable, is to my mind a strange proposition. It would be making the created equal to the creator. As individuals, *404 they might have been the founders ; but as the lecturers and professors of the Medical society, under both the express and implied terms of their appointments, whatever they did was under the charter already granted to the Medical society, to organize the Medical school, and to give it effect: when done, and the school went into operation, it was the Medical school or college of the Medical society. In obtaining the appropriation, from the city council, of $15,000, the professors, as individuals, gave their bonds for the performance of the conditions annexed by the council to the appropriation, and this might have given some plausibility to their claim to be regarded as the founders, had it not been that their application was in their derivative character, as the faculty of the Medical school ; an institution already in existence, and not one which was to be established ; the appropriation was made to them in that character, and the execution of the bonds, as individuals, was required by the city council, as affording a better security than any which they could execute in a corporate capacity. This is, clearly, not a new foundation, but is in aid of that which had already been made. Whatever acts the faculty did in obtaining this, or any other endowment, is not only binding on themselves, but also on their principal, the Medical society.
By the 1st article of the rules and regulations of the Med- , ical College of South Carolina, it is provided that, “ the faculty of the college shall consist of seven professors, who shall be elected by the Society by ballot, and who shall deliver lectures on the following subjects, viz : Anatomy, surgery, materia medica, institutes and practice of physic, obstetrics and diseases of women and infants, chemistry and pharmacy, and natural history and botany. The lectures shall be delivered during the months of November, December, January, February and March, liable to such particular regulations, as regards the frequency and number of lectures of each professor, as shall be adopted by the faculty^ subject to the revision of the Medical Society. If any professor, elected by the Society, shall fail or neglect- to prepare a sufficient course of lectures, by the time appointed for the commencement of the operations of the school, his chair *405 shall be declared vacant, and the Society shall proceed to another election” This shows that the faculty were made perfectly dependant on the Society, not only for their election, but also in relation to the discharge of their duties. They became officers of the Medical Society, charged with the care of a particular department; and out of the discharge of their duties could not grow a totally distinct body or corporation.
But they were not even left to their own enterprize and skill, in the organization and management of the school. The 2d article provides that the honorary members of the Society shall be a board of trustees, “ to watch ovei and promote the best interests of the institution ; to aid and assist the faculty with their countenance and advice, in the government of the school, and in the furtherance of the objects which it is intended to accomplish.” It also directs that, at a special meeting, on the first Monday in April, the Medical Society “ shall receive an annual report of the proceedings of the faculty, through then deau,” particularly designating the subjects upon which it shall communicate information. It would seem from these two provisions, that the Medical College was regarded by the Medical Society and the faculty as an institution belonging to the former, and entirely subject to their parental care and control. To argue, after having become professors under such rules, that the college was not a part of the Medical Society, deriving existence from them, and subject to their government, would seem to imply that the agent might, at any time, set up for himself and deny the authority of his principal over the subject committed to his care. Such a course might be sometimes useful to the agent; but it could never be tolerated by the principal or allowed by the law.
The power to confer degrees, by the Act of 1823, is conferred distinctly upon the Medical Society in the Medical School or college by them to be organized. As I have before said, this made them the medical college; the professors are their instructors, and in that character became a part of it; but, independent of the Society, they had no power of conferring degrees. This power the Medical So *406 ciety have never parted with, and they still have the right to its exercise. In the 4th article, after making some regulations in relation to character, previous study, and a written dissertation to be prepared by each student, it is provided : “ At the end of his second course, each candidate shall be entitled to a private examination before the faculty, and, if approved by them, he shall appear before the Society, at their meeting on the first Monday in April, at which time and place he shall defend his dissertation or thesis. The opinion of the Society respecting the fitness or unfitness of each candidate shall be expressed in the usual form of balloting ; a majority of two-thirds of the members present, in his favor, shall be necessary to entitle Mon to his degree. At a public meeting of the society, to be held the next day, or as soon thereafter as may be convenient., and to which the literary and professional gentlemen of the community shall be specially invited, the candidates who have passed their previous examination shall be introduced and receive their respective diplomas, from the hands of the president of the Society, who shall, at the same time, deliver a suitable address. In order to shew, on the part of the Society, a marked encouragement for classical attainments, a premium of twenty dollars, in money or books, shall be annually offered for the best Latin or Greek thesis or dissertation.”
The 5th article directs “ that a candidate for a medical degree, having met the approbation of the faculty of the Medical college of South Carolina, shall defend his thesis before the Medical society, and this shall be the final examination.” Every onepf these provisions shews that the Medical society was the legal head or patron of the Medical college, and that, without their assent, none of its honors or privileges could be granted. The State had no right to resume this grant at pleasure ; it is a privilege conferred on a private corporation, and not a duty required to be done by it. The examination and licensing of physicians and apothecaries by the Medical Society, as a board of physicians, under the Act of 1817, was a dutyr to the community, to be performed by them ; for this purpose they were the State’s agents, and she could, at any time, *407 end the agency by repealing the law, or revoke and commit the agency to others.
But it is said, notwithstanding all these views, still the faculty of the Medical college must be regarded as a distinct corporation, on account of the appropriations made by the Acts of 1825 and 183U. I have no doubt that, if a body of men, not entitled to a legal name as a body politic and corporate, should be described in an Act of the Legislature by a name and style, that this would impliédly give them such a legal right to the name and style, as would at least legally entitle them to the benefit of the Act. But I do not think this can benefit the faculty. The appropriations were for the “ Medical College,” and to be drawn by or paid to the order of the faculty. The Acts themselves obviously make a distinction between the college and the faculty of the college. They are supposed to be two different bodies known to the law. What was, at the time the Acts making the appropriations were passed, the Medical college 1 It then consisted of the Medical society, the trustees, and the faculty ; for these were the different parts of the body, according to its organization in the rules and regulations. No one of these was the college; although if the society had pleased, in the organization of the school, they might have directed the several members, in rotation, to have discharged the duties of the professorships, and thus have dispensed with permanent professors altogether. So, too, they might have performed themselves the duties of the trustees, and thus have continued, as they were in the first instance, the Medical college. For 1 am satisfied that the power to confer degrees made them, legally, a medical college. If the college, at the time the Acts were passed, was the society, the trustees and faculty, then the appropriation was for a body in legal existence, and having a legal name, and did not set up a new corporation. The result of this examination is, that the Medical society, under its charter, as extended by the Act of 1823, founded the Medical college; that all the endowments, whether made by the professors, the city council, or the State, must be regarded as made in aid of the original foundation. It is, therefore, a private institution, founded by a private cor *408 poration, unless its object, public instruction,’should make it a public one. The division of corporations into public and private, will be more simple and easily understood as political and private. Whatever belongs to the public, or people composing" a government, or is instituted for the good government of any part oí the people, is a public or political corporation. Private corporations are such as are instituted for the benefit of certain persons as individuals, or for the purpose oí applying private funds or enterprize and skill to the public good. “Public corporations are such as exist for public political purposes only, such as counties, cities, towns and villages. They are founded, by the government, for public purposes, and the whole interest in them belongs to the public. But, if the foundation be 'private, the corporation is private, however extensive the uses may be to which it is devoted by the founder, or the nature of the institution. A bank, created by the government for its own uses, and where the stock is exclusively owned by the government, is a public corporation.”— “ A hospital, founded by a private benefactor, is, in point of law, a private corporation, though dedicated by its charter to general charity. A college, founded and endowed in the same manner, is a private charity, though from its general and beneficent objects, it may acquire the character of a public institution.” “To hold a corporation to be public because the charity was public, would be to confound the popular with the strictly legal sense of terms, and jar with the whole current of decisions since the time of lord Coke.” 2 Kent Com. 222-3. In Philips vs. Bury, 2 T. R. 352, lord Holt, speaking of public corporations, said that “ those that are for the public government of a town, city, university, or the like, being for public advantage, are to be guided according to the laws of the land.” “ But private and particular corporations for charity, founded and endowed by private persons, are subject to the private government of those who erected them.” It is clear from these authorities that the object of the Medical college does not make it a public or political corporation, and that, as a private corporation, it is subject to the government of the Medical society, who erected it.
*409 Having arrived at the conclusion that the Medical college is a private corporation, or, to speak more properly, is part of a private corporation, the Medical society, it now only remains to be seen what is the legal effect of this conclusion upon the constitutionality of the Act of 1831, incorporating the Medical college.
The Act of 1823 is a contract between the State and the Medical society, whereby the State, in consideration of the establishment of the Medical school by them, conferred upon the Medical society the powers to organize the school, to establish the professorships, to confer medical degrees, and to make all laws necessary for its government. The Act of 1831, transferring all these powers to the new corporation, is a plain violation of the contract.
Under the 10th Sec. of the 1st Article of the Constitution of the United States, each State is prohibited from passing any law impairing the obligation of contracts. By the Constitution of this State, the people have prohibited the Legislature from passing any such law. This prohibition of the Constitution of the United States, and of this State, applies in as much, if not more, force to a contract made by the State with an individual, or corporation, as it does to a contract between citizen and citizen.— Dartmouth College vs. Woodward, 4 Wheat. 518.
The Act, regarded even as the grant of a franchise, is still as much a contract binding on the State, as the grant of a tract of land by an Act of the Legislature would be, and this, according to the case of Fletcher vs. Peck, 6 Cra. 87, cannot be annulled by the same or a subsequent Legislature.
But, in another point of view, I think the unconstitutionality of the Act of 1831 is too apparent to be doubted, after having arrived at the conclusion that it is in derogation of the rights of a private corporation.
The English Parliament is the supreme authority of Great Britain, and, according to Blackstone, whatever it does, “ no authority upon earth can undo.” 1 Blac. Com. 161. This supreme uncontrolable power is derived from the supposition that the King, lords and commons, are the estates and people of the realm, and from the government *410 thus constituted, all power and authority to the other departments emanates. But in this State the government is strictly representative of the people, and all the powers exercised by any of its departments, are derivative from them, under their constitution. The three different departments, the Executive, Legislative, and Judicial, are co-ordinate ; neither has any superior in its particular sphere of action, save the will of the people, the constitution, to which, as the source from which each derives the power it exercises, obedience is due. If either transcends the department to which the people have assigned it, or exercises a power not granted to it, or which is prohibited to be exercised, the act is void and has no effect j for it ivas done ivithovt the authority of the people, and, without this, no department of our government can act. “ The Legislative authority of this State is vested in a General Assembly,” consisting of the Senate and House of Representatives. 1 Sec. 1st Art. Oonst’n So. Ca. So far as the making of laws, which are to regulate the people of the State, considered as members of a civil community, or the granting, by the State, as a sovereign power, of any of her property, offices, franchises, privileges or immunities, the Legislature have the right to act as they please, if they conform to the forms and requisites of the constitution. But if they undertake to exercise either Executive or Judicial power, it is an usurpation of the rights of the people, which they have confided to another department, and which, however unwelcome an office it may be, it becomes the duty of the Judiciary, as the representative of the people, to resist and control.
An Act of the Legislature which takes from one man his property, or rights, and gives it, or them, to another, on a claim of right, is the exercise of Judicial power, which is “ vested in such superior and inferior courts of law and equity, as the Legislature” have, fiom time to time, directed and established — 1 Sec. 3 Art. Const. So. Ca. — and is, therefore, prohibited, by the people, from being exercised by the Legislature. So, too, to divest a corporation of any of its rights, privileges, or immunities, is the exercise of Judicial power ; and the more especially, as in the case before us, where the question is, whether the Legislature *411 have before granted the rights, privileges, and immunities, which they now claim the right to confer on another corporation. If these have not before been granted to another corporation, the Act now granting them for the first time, trenches upon no vested rights, and cannot be questioned ; but if they have before been granted, nothing remains in the State to be granted, and. she cannot resume her grant, or transfer it to another, until a forfeiture of the grant is judicially ascertained and established.
In England, the creation of a corporation is within the King’s prerogative, but still, as an incident to supreme power, the Parliament may exercise, and have exercised, the right to incorporate. 1 Blac. Com. 472 — 3—4. I am not disposed to say that the power of creating a corporation, as a part of the King’s prerogative, belongs to the Legislature ; for I regard the whole doctrine of prerogative rights as utterly inapplicable to the simplicity of republican governments. The right to grant a corporate franchise belongs to Legislative power, as being, in this respect, the entire representative of the sovereignty of the people; yet notwithstanding it is thus rightfully to be regarded as falling within the grant of Legislative power, it cannot be exercised, as in general legislation, to enact and repeal at pleasure. In one sense, an Act of incorporation is a law ; but in another, it is only a grant, by the whole people, of certain powers, rights, privileges, and immunities, to a part of the people. It is a law, inasmuch as it constitutes a rule of action, by which the corporators and all the community, are to be governed in relation to the body politic and corporate. But, as between the State and the corporators, it is a grant of certain powers, rights, privileges, and immunities, which, by the Act of incorporation, pass out of the State, and are vested in the corporation ; and can only be forfeited by a breach of the implied condition on which the grant is made, misuser or nonuser ; “ in which case the law judges that the body politic has broken the condition on which it was incorporated, and, therefore, the incorporation is void.” 1 Blac. Com. 485. The 2d Sec. of the 9th Art. of the Constitution of So. Ca. provides that “no freeman of this State shall be taken, or imprisoned, or disseized of *412 his freehold, liberties or privileges, or outlawed, or exiled, but by the judgment of his peers or by the Imp of the land: nor shall any bill of attainder, ex post facto law, or law impairing the obligation of contracts, ever be passed by the Legislature of this State.”
A bodypolitic and corporate is not, it is true, a freeman, within the words of this section ; yet it is composed of freemen, who are entitled to all the privileges conferred upon them by the Act of incorporation, and of these they cannot be disseized but by the judgment of their peers, or by the law of the land ; and of course the corporation can only be forfeited or deprived of any of its privileges in the same way.
Judge Kent, in the 2d volume of his Commentaries, p. 244, thus sums up the doctrine of visiting corporations : “ The
better opinion seems, however, to be, that any corporation chargeable with trusts may be inspected and controled and held accountable in chancery for an abuse of such trusts. With that exception, the rule seems to be that all corporations are amenable to the courts of law; and then only according to the course of the common law, for nonuser or misuser of their franchises."
It would hence seem that, both by the constitution and the common law, a corporation can only be deprived of its powers, rights, privileges, and immunities, by a judgment of forfeiture, obtained according to the law of the land.— By this, I understand a trial had, and a judgment pronounced, in the court of law of this State.
From these views, we are constrained to pronounce and declare the Act of the General Assembly, “ to incorporate the Medical College of South Carolina,” passed on the 17th of December, 1831, unconstitutional.
The motion to reverse the decision of the Judge below, is granted ; and leave is given to the relators to file the information in the nature of a quo warranto.
Johnson, J. concurred.